SENECA LOYAL NEAL
REG. NO. 36074-086
FCI SAFFORD
FEDERAL CORR. INSTITUTION
P.O. BOX 9000
SAFFORD, AZ 85548
Appearing *Pro Se*



RECEIVED

MAR 03 2026

CLERK, U.S. DISTRICT COURT
FAIRBANKS, AK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CR. NO. 4:14-cr-00027-RRB-1 |
| Plaintiff, ) | |
| ) | MOTION FOR COMPASSIONATE |
| vs. ) | RELEASE PURSUANT TO |
| ) | 18 U.S.C. § 3582(C)(1)(A) AND |
| SENECA LOYAL NEAL, ) | FIRST STEP ACT OF 2018 |
| ) | |
| Defendant. ) | |
| ) | |

COMES Defendant, SENECA LOYAL NEAL ("Neal"), appearing *pro se*, and in support of this motion would show as follows:

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id*. However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by

1

the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.   Procedural Background

On December 16, 2014, the United States Attorney in the United States District Court for the District of Alaska, returned a seven (7) count Felony Indictment charging Neal and Lamon Glenn Washington ("Washington"), his co-defendant. See Doc. 2.[1] Count 1 charged Neal with Conspiracy to Distribute and Possess with Intent to Distribute 1 Kilogram or More of Heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A). *Id.* Counts 5 and 7 charged Neal with Distribution of 100 Grams or More of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). *Id.* Count 6 charged Neal with Distribution of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *Id.* The Indictment also contained a Criminal Forfeiture Allegation pursuant to 21 U.S.C. § 853(p). *Id.*

On May 26, 2016, the government filed an Information to Establish Prior Conviction with the Intention to Seek Enhance Penalties, pursuant to 21 U.S.C. § 851 ("851 Enhancement"). See Doc. 145.

On August 15, 2016, a 3-day jury trial commenced. See Docs. 183, 185, 187.

On August 17, 2016, the jury returned guilty verdicts on Counts 1, 5, 6, and 7 of the Indictment. See Doc. 191.

On December 12, 2016, Neal was sentenced to total term of 264 months' imprisonment, 10 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $400. See Docs. 224, 225.

---

[1] "Doc." refers to the Docket Report in the United States District Court for the District of Alaska, in Criminal No. 4:14-cr-00027-RRB-1, which is immediately followed by the Docket Entry Number.

On December 16, 2016, Neal timely filed a Notice of Appeal. See Doc. 228.

On August 28, 2018, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") affirmed Neal's Judgment. See Docs. 241, 267, 269.

On October 4, 2018, Neal filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which was denied on May 26, 2021. See Docs. 270, 316.

On February 10, 2021, Neal filed a Motion for Compassionate Release, which was denied on March 1, 2021. See Docs. 307, 311.

On June 11, 2021, Neal filed a Notice of Appeal re: Denial of his § 2255 Motion, however, the Ninth Circuit affirmed the District Court's Judgment on June 14, 2022. See Docs. 320, 328, 329.

On September 6, 2022, Neal filed a Petition for a Writ of Certiorari, which was denied by the United States Supreme Court on October 11, 2022. See Docs. 330, 331.

## B.    Statement of the Relevant Facts

In October 2014, Alaska State Troopers executed a search warrant at the Wasilla residence of Brendan Strom as part of a heroin investigation. Strom cooperated, showing troopers where he kept heroin and admitting that he purchased approximately 10 ounces each week from Seneca Neal for $30,000. He stated he had just purchased heroin from Neal the night before and surrendered nearly 10 ounces to the troopers. Strom provided directions to Neal's residence and described his vehicle—a Mercedes-Benz SUV. Records from APSIN and the DMV confirmed Neal's address on West 45th Avenue in Anchorage and his ownership of the Mercedes. Surveillance at that location further confirmed his presence.

Relying on this information, troopers obtained a warrant to install a GPS tracker on Neal's vehicle. Tracking and surveillance revealed a pattern: Neal regularly parked near a small apartment building on Arctic Boulevard, then walked inside for only a few minutes before returning to his car.

In late November, troopers observed Neal enter the apartment building, remain inside for about ten minutes, and return to his residence. Shortly

3

thereafter, a woman—later identified as Christina Solomon—arrived in a minivan, entered Neal's home briefly, and then departed. Troopers followed her to a parking lot nearby, where one trooper observed her smoking heroin off aluminum foil. When contacted, Solomon turned over her phone. Texts on the phone, sent by a contact listed as "Seneca," reflected an ongoing heroin-dealing relationship.

Based on this, troopers secured a warrant to search Unit 5 of the Arctic Boulevard building, believing Neal used it because of its minimal foot traffic compared to other units. However, while surveilling the building, troopers observed Neal enter and exit Unit 3. When approached, Neal stated that the unit was rented by a friend named "Shawn," and that he was merely checking on it. A property manager and other tenants confirmed a man matching Neal's description occasionally visited the unit on foot, but was rarely present otherwise.

Neal later admitted to renting Unit 3 but claimed he did so for "Shawn." A pat-down search revealed a wallet containing a large sum of cash. Troopers then obtained a warrant to search Unit 3, Neal's residence, and his person. The search of Unit 3 uncovered 451 grams of heroin hidden in a backpack inside a fold-out couch, along with a digital scale. Additional cell phones were seized from Neal and his residence. Warrants to search those phones followed.

Further investigation linked Neal with Washington of Fairbanks. Both men were indicted as co-conspirators for heroin distribution, possession with intent to distribute, and conspiracy to distribute controlled substances. See Doc. 2.

  2. Trial Proceeding

On August 15, 2016, a 3-day jury trial commenced before Judge Ralph R. Beistline. See Doc. 183. The Government's trial case rested heavily on cooperating witnesses, disputed law enforcement testimony, and circumstantial connections between Neal and the heroin seized in Unit 3. The Magistrate Judge did not review the recording of the arrest and relied solely on the Troopers' testimony. He concluded that Trooper Calt's warrantless entry required excising his observation of Neal from the affidavit supporting the search warrant, but determined that the remaining

4

untainted evidence still established probable cause to search Unit 3. In conclusion of the trial, on August 17, 2016, the jury found Neal guilty on Counts 1, 5, 6, and 7 of the Indictment. See Doc. 191.

### 3. Sentencing Proceeding

On December 12, 2016, a Sentencing Hearing was held before Judge Ralph R. Beistline. See Doc. 224. At sentencing, Neal received to total term of 264 months; consisting of 264 months on Count 1, 120 months on each counts 5, 6, and 7, to run concurrently to each other and consecutively to the sentence imposed in Case No. 3:09-cr-00127-02-RRB. See Doc. 225. It is followed by 10 years of Supervised Release. *Id.* The Court also ordered payment of a Mandatory Special Assessment Fee of $400. *Id.* Neal appealed. See Doc. 228.

### 4. Appellate Proceeding

On Appeal, Neal argued that his initial contact with the officers in the common hallway was (1) unlawful because it amounted to an arrest without a warrant inside his home; and (2) a custodial interrogation not preceded by *Miranda* warnings. As a result, Neal contended that evidence obtained from this initial contact (a body recording and a seized cell phone) should have been excluded at trial because they were "tainted fruit." However, the Ninth Circuit believed that the district court did not plainly err by admitting this evidence because Neal has not shown that it was "clear" or "obvious" that his initial contact with the officers in the common hallway amounted to an "arrest" or a custodial interrogation requiring *Miranda* warnings. *United States v. Liew*, 856 F.3d 585, 596 (9th Cir. 2017) (setting forth plain error standard of review). Further, Neal has not shown that his substantial rights were affected by the admission of the body recording and the cell phone. See *id.* Contrary to Neal's contention, the Ninth Circuit found that the government has sufficiently shown that it timely disclosed the body recording to Neal's counsel. Therefore, the Court declined Neal's request to remand for an evidentiary hearing. See Doc. 267. //

5

### 5. Postconviction Proceeding

On October 4, 2018, Neal filed a Motion under § 2255 Motion. See Doc. 270. On his Motion, Neal argued that even more evidence would have been deemed "tainted" were it not for the ineffective assistance of counsel. The clearest ineffective assistance issue arises from trial counsel's mishandling of Sergeant Nelson's audio recordings. Counsel received the recordings months before the suppression hearing but failed to use them to impeach troopers' testimony about the building entry and initial contact with Neal. This omission forfeited a strong suppression argument and left the government's account unchallenged. At trial, counsel compounded the problem by not opposing admission of the recordings and even requesting portions be played, despite their ambiguities cutting both ways. In contrary, this Court agreed with the Ninth Circuit's decision on Neal's Appeal that the government adequately showed that the recordings had been timely disclosed to defense counsel, therefore no remand for an evidentiary hearing was warranted. Also, with respect to Neal's argument that the officers looked through his phone before securing a warrant, there was no evidence that the officers relied upon anything in his phone to get a warrant to search Unit 3. Thus, the District Court ultimately denied his motion. See Doc. 316.

## III. DISCUSSION

As a preliminary matter, Neal respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Pouncil v. Tilton*, 704 F.3d 568 (9th Cir. 2012); *Estelle v. Gamble*, 429 U.S. 97 (1976)(same); and *Haines v. Kerner*, 404 U.S. 519 (1972)(same).

### A. Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Neal's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies.

6

The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1. Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

## 2. Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

Pursuant to section 994(p) of title 28, United States Code, the United States Sentencing Commission hereby submits to the Congress the following amendments to the Guidelines Manual and the reasons therefor. As authorized by such section, the Commission specifies an effective date of November 1, 2023, for these amendments:

(b) *Extraordinary and Compelling Reasons.–* Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

(1) *Medical Circumstance of the Defendant.–*

(A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

(B) The defendant is—

(i) suffering from a serious physical or medical condition,
(ii) suffering from a serious functional or cognitive impairment, or
(iii) experiencing deteriorating physical or mental health because of the aging process, that

8

substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D) The defendant presents the following circumstances—

    (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

    (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

    (iii) such risk cannot be adequately mitigated in a timely manner.

(2) *Age of the Defendant.*— The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

9

(3) *Family Circumstances of the Defendant.—*

(A) The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D) The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4) *Victim of Abuse.—* The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

(A) sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

10

(B) physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant. For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5) *Other Reasons.*— The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6) *Unusually Long Sentence.*— If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

This amendment responds to, among other things, the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239, which amended 18 U.S.C. § 3582(c)(1)(A) to authorize courts to grant a motion for a sentence reduction upon a defendant's own motion. Previously, a court was authorized to do so only upon the motion of the Director of the Bureau of Prisons ("BOP"). Congress amended the law for the express purpose, set forth on the face of

11

the enactment, of "increasing the use" of sentence reduction motions under section 3582(c)(1)(A). First Step Act § 603(b).

### 3. The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id*. at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4. Strong Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

12

On October 20, 2025, Neal has filed a request for compassionate release to Mr. Stone, Warden at FCI Safford, however, Mr. E. Gutierrez, Acting Warden, FCI Safford, denied his request on October 21, 2025. See Exhibit 1. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on Strong' behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.**      **The Changes in Relevant Law, along with Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Are Extraordinary and Compelling Circumstances That Warrant Release.**

Section 3582(c) states that a district court cannot modify a term of imprisonment once it has been imposed except that, in any case:

> The court, upon motion of the Director of the Bureau of Prisons, or the defendant, pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> > (i)      extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A).

In this case, there are at least five extraordinary and compelling reasons warranting such a reduction, discussed as follows:

1.      Requests Based on Non-Medical Circumstances–Incapacitation of the Prisoner's Mother Due to Health Issues

Neal respectfully submits this request for compassionate release on the grounds of extraordinary and compelling circumstances arising from the incapacitation of his mother, Debra Womack ("Womack"), and the severe hardship this has created for his

13

family. Womack, a 72-year-old veteran, suffers from multiple serious and chronic medical conditions, including a pelvic fracture, persistent and debilitating pain, diabetes, and ongoing wound care needs. See Exhibit 2. She is primarily wheelchair-bound, requires substantial assistance with daily living, and her medical records reflect the physical and emotional challenges she faces, including frequent agitation and distress due to her limited mobility and pain. *Id.*

For the past ten years, Cheyenne White ("White"), Neal's daughter has been the primary caregiver for both Womack and Neal's stepfather, providing daily support and managing their medical needs. Last year, Neal's stepfather passed away, leaving the household solely dependent on White. The family has since faced severe financial strain and is now at risk of losing their home because they cannot afford the mortgage. In order to cover these essential expenses, White was forced to seek full-time employment outside the home. As a result, she is no longer able to provide the care that her grandmother requires, leaving Womack vulnerable and without consistent support. White's should not have to shoulder responsibilities that Neal, as the adult child and sole remaining caregiver, is responsible for.

Neal was previously the primary caregiver for his mother, and his presence in the home is now critical to ensure her safety and well-being. Compassionate release would allow Neal to stabilize the household, provide consistent care for Womack, and relieve the undue burden placed on White, who must now balance employment with caregiving obligations. Courts, including the Ninth Circuit in *United States v. Aruda*, have recognized that the incapacitation of a family member and the absence of an adequate caregiver constitute extraordinary and compelling circumstances warranting relief under 18 U.S.C. § 3582(c)(1)(A)(i). Other courts have similarly acknowledged that the need to be the only available caregiver for an incapacitated parent presents a legitimate basis for compassionate release.

Given the severity of Womack's health issues, the loss of Neal's stepfather, and the family's financial and caregiving hardships, Neal respectfully requests that the Court grant compassionate release so that he may return home to provide

14

necessary care for his mother and alleviate the undue burden currently borne by his daughter. This relief is consistent with the statutory intent of compassionate release and the sentencing factors set forth in 18 U.S.C. § 3553(a), including Neal's history, family circumstances, and the need to promote justice and compassion.

### 2. First Step Act of 2018: Sentencing Reform

Under the First Step Act, the mandatory minimum sentences for certain non-violent federal drug offenses have been reduced. This includes specifically the mandatory minimum sentences for repeat offenders. Under the FSA:

- The 20-year mandatory minimum sentence for repeat offenders with one prior qualifying conviction is reduced to 15 years.
- The mandatory life sentence for repeat offenders with two or more prior qualifying convictions is reduced to 25 years.
- In order for any mandatory minimum sentence to apply, the defendant's prior conviction must qualify as either a "serious drug felony" or a "serious violent felony."

The First Step Act defines a "serious drug felony" as a crime that, "carr[ies] a maximum prison term of 10 years or more—for which the offender served a term of imprisonment of more than 12 months and the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense." The FSA defines a "serious violent felony" as a crime, "for which the offender served a term of imprisonment of more than 12 months . . . ."

Under the First Step Act as currently amended, the 851 enhancements for defendants convicted of 10 year minimum drug charges would change to 15 years for those with one prior and 25 years for those with two. Thus, mandatory life would be abolished.

Under the current scheme, the government often does not seek 851 enhancements where the defendant agrees to plead guilty– which results to relatively less leverage for the government in plea negotiations and more federal drug cases may go to trial. At the same time, the new scheme could potentially increase the government's negotiating leverage by encouraging greater enforcement of the

15

now-diminished penalties. As things stand now, federal prosecutors often decline to seek mandatory life due to the perceived severity of that sentence, even for repeat offenders. However, with the enhancement for two priors reduced from life to 25 years, we could see more energetic enforcement of the enhanced penalties for defendants with two priors.

If Neal was sentenced after the passage of the First Step Act, the government would not seek for an enhanced penalty under 21 U.S.C. § 851. Hence, his guideline range would be no more than 15 years.

*Serious Drug Felony*

A serious drug felony is defined as an offense described in 18 U.S.C. Section 924(e)(2)—which encompasses only drug felonies that carry a maximum prison term of 10 years or more—for which the offender served a term of imprisonment of more than 12 months and the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense. Before the First Step Act, any prior conviction for a felony drug offense (meaning a drug offense with a maximum term of imprisonment of more than one year) counted for purposes of the repeat offender mandatory minimums.

Neal's sentence was enhanced pursuant to 21 U.S.C. § Section 851. See Doc. 145. The said enhancement was used because Neal was duly convicted in this Court, on or about May 10, 2010, Case No. 3:09-cr-127-RRB, of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base and a quantity of cocaine, a felony. *Id.* Wherein, Neal was sentenced to a term of 3 years and 5 months' imprisonment. *Id.*

Conspiracy to Distribute and Possess with Intent to Distribute 50 Grams or More of Cocaine Base and a Quantity of Cocaine Is Not A Serious Felony Offense

*United States v. Norman*, 935 F.3d 232, 237-38 (4th Cir. 2019) held that conspiracy under 21 U.S.C. § 846 is not a "controlled substance offense." Neal argues that the reasoning in *Norman* extends to the conclusion that a RICO conspiracy

16

involving underlying drug offenses similarly cannot be a "controlled substance offense" under USSG § 4B1.2(b).

Specifically, the *Norman* court reaffirmed the principle that although USSG § 4B1.2 extended to certain conspiracy offenses, "'an overt act is an element of the generic definition of 'conspiracy' as incorporated into § 4B1.2." *Id.* at 237 (quoting *United States v. McCollum*, 885 F.3d 300, 308 (4th Cir. 2018)). In contrast, "'conspiracy' under § 846 does not require an overt act." *Id.* at 238 (citing *United States v. Shabani*, 513 U.S. 10, 11 (1994)). Thus the Fourth Circuit concluded that "a 'conspiracy' conviction under § 846 is a categorical mismatch to the generic crime of conspiracy enumerated in § 4B1.2(b)" and could not be the subject of a career offender enhancement. *Id.* at 239.

Like § 842, "the RICO conspiracy statute contains 'no requirement of some overt act or specific act.'" *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) (quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997)): Thus, as with § 842, RICO conspiracy cannot qualify as a "controlled substance offense" under USSG § 4B1.2 and cannot, therefore, be the type of "instant offense of conviction" that qualifies for a career offender enhancement under the Guidelines. See USSG § 4B1.1(a) ("A defendant is a career offender if [inter alia] ... the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense."); see also *United States v. Lisbon*, 276 F. Supp. 3d 456, 459 (D. Md. 2017) (holding based on similar reasoning that "Lisbon's conviction for RICO conspiracy does not constitute a 'controlled substance offense' subject to enhancement under the career offender provision.").

Therefore, in light of *Norman*, the same reasoning should apply to Neal's case and resentenced him absent the 851 Enhancement.

3.  Neal's Remarkable Rehabilitation

Over the past decade, Neal has quietly and steadily transformed himself. The man who entered federal custody in 2016 is not the man who stands before the Court today. What began as punishment has become rehabilitation in the truest sense of the

17

word—measured not in promises, but in record, conduct, and sustained change.

The Bureau of Prisons' most recent Summary Reentry Plan tells a story that numbers alone cannot fully capture. See Exhibit 3. Neal is now classified as LOW risk for recidivism. *Id.* He has no outstanding criminogenic needs in education, substance abuse, mental health, work, trauma, family, finance, or antisocial peers. He has satisfied his financial obligations in full. *Id.* He maintains regular duty status. He is cleared for institutional work assignments. And aside from a single disciplinary infraction dating back to 2010—more than fifteen years ago—his record reflects sustained compliance and stability. *Id.*

But rehabilitation is more than the absence of misconduct. It is the presence of growth.

During his incarceration, Neal completed his GED and demonstrated English proficiency. *Id.* He undertook financial literacy courses, including FDIC's Money Smart and Financial Peace, gaining the tools necessary to manage lawful income responsibly upon release. *Id.* He completed parenting and life-skills programming, resume writing and job interview preparation, professional etiquette training, and the Resolve Workshop. *Id.* He engaged in meditation, wellness classes, yoga, and structured self-improvement programming—choosing discipline and reflection over idleness. *Id.* These were not isolated efforts clustered around a release date. They represent years of consistent participation and internal work.

The Supreme Court has recognized that post-sentencing rehabilitation provides "the most up-to-date picture" of a defendant's history and characteristics. *Pepper v. United States*, 562 U.S. 476, 492 (2011). That principle carries particular force here. Sentencing is not frozen in time. When a court evaluates the purposes of punishment under 18 U.S.C. § 3553(a), it must consider the individual as he stands before the Court today—not merely as he once was.

The Ninth Circuit has made clear that district courts possess broad discretion to consider post-sentencing developments when evaluating sentence reductions. In *United States v. Aruda*, 993 F.3d 797 (9th Cir. 2021), the court confirmed that judges

18

are not confined to outdated policy statements in determining what constitutes extraordinary and compelling reasons. In *United States v. Chen*, 48 F.4th 1092 (9th Cir. 2022), the Ninth Circuit reiterated that district courts may consider a full range of equitable factors in compassionate release proceedings. Other circuits have echoed this approach, recognizing that extraordinary rehabilitation—especially when documented and sustained—can weigh heavily in the § 3553(a) analysis. See, e.g., *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020); *United States v. Maumau*, 993 F.3d 821 (10th Cir. 2021).

Neal's record is not one of routine compliance. It is one of deliberate transformation. The Bureau of Prisons now assesses him as low risk. He has eliminated all identified criminogenic needs. He has met every financial obligation imposed upon him. He has prepared himself vocationally and emotionally for lawful reentry. These objective metrics confirm what his conduct reflects: accountability, maturity, and change.

The purposes of sentencing must be measured against present reality. Specific deterrence carries diminished weight where the individual has demonstrated sustained reform and is officially assessed as low risk. Protection of the public is advanced—not undermined—by recognizing rehabilitation that the BOP itself has verified. Continued incarceration, where correctional goals have been met, yields diminishing returns.

Rehabilitation cannot erase the past. But it can—and here, it does—transform the future.

Overall, Neal has used his time in custody not merely to serve a sentence, but to rebuild himself. The law permits this Court to consider that transformation. Justice, in this case, calls for it.

      4.    First Step Act— Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

This motion is brought pursuant to the First Step Act of 2018, Pub. L. No. 115-391 (Dec. 21, 2018) ("First Step Act" or "the Act"), which significantly

19

expanded the availability of compassionate release. Most notably, the Act amended 18 U.S.C. § 3582(c)(1)(A) to permit defendants to file motions for sentence reductions directly with the Court, thereby eliminating the Bureau of Prisons' exclusive gatekeeping authority and reflecting Congress's intent to broaden judicial discretion in identifying "extraordinary and compelling reasons."

The Ninth Circuit has expressly recognized that, following the First Step Act, district courts are no longer constrained by the pre Act policy statement in U.S.S.G. § 1B1.13 when considering defendant-filed motions. In *United States v. Chen*, 48 F.4th 1092, 1098–1100 (9th Cir. 2022), the court confirmed that district courts possess independent discretion to determine what constitutes extraordinary and compelling reasons, guided—but not limited—by the Sentencing Commission's policy statements. Similarly, in *United States v. Aruda*, 993 F.3d 797, 802–03 (9th Cir. 2021), the Ninth Circuit emphasized that the policy statement in § 1B1.13 does not constrain courts evaluating compassionate-release motions filed by defendants themselves, and that post sentencing changes in circumstances—both personal and legal—may inform the extraordinary-and-compelling analysis.

In addition to expanding compassionate release, the First Step Act reduced certain sentencing enhancements under 21 U.S.C. § 851, broadened the "safety valve" provision in 18 U.S.C. § 3553(f), limited the stacking of mandatory minimum sentences under 18 U.S.C. § 924(c), and made the Fair Sentencing Act of 2010 retroactive. Collectively, these reforms underscore Congress' determination that excessively long sentences imposed under prior regimes may warrant reconsideration.

Consistent with this statutory framework, Amendment 814 to the Sentencing Guidelines substantially revised U.S.S.G. § 1B1.13, including the expansion of qualifying "extraordinary and compelling reasons." Of particular relevance here, § 1B1.13(b)(6) now recognizes "Unusually Long Sentences" as a standalone basis for relief. Under this provision, a defendant who has served at least ten years of an unusually long sentence may establish extraordinary and compelling reasons where

20

a change in the law—other than a non-retroactive Guidelines amendment—would produce a gross disparity between the sentence imposed and the sentence likely to be imposed today, following individualized consideration of the defendant's circumstances.

The Ninth Circuit has repeatedly emphasized that non-retroactive changes in sentencing law may properly be considered as part of the extraordinary-and-compelling analysis. In *United States v. Chen*, 48 F.4th at 1098–1100, the court held that district courts may evaluate both the combined effect of legal changes and a defendant's individualized circumstances in assessing whether a reduction is warranted. Other circuits are in accord. The Fourth Circuit has held that district courts may treat the length of a sentence and subsequent changes in sentencing law as extraordinary and compelling reasons for relief. *United States v. McCoy*, 981 F.3d 271, 285–87 (4th Cir. 2020). Similarly, the Tenth Circuit has recognized that "the sheer length of a sentence," when combined with changes in the legal landscape, may justify compassionate release. *United States v. McGee*, 992 F.3d 1035, 1047–48 (10th Cir. 2021).

Other circuits are in accord. The Fourth Circuit has held that district courts may treat the length of a sentence and subsequent changes in sentencing law as extraordinary and compelling reasons for relief. *United States v. McCoy*, 981 F.3d 271, 285–87 (4th Cir. 2020). Similarly, the Tenth Circuit has recognized that "the sheer length of a sentence," when combined with changes in the legal landscape, may justify compassionate release. *United States v. McGee*, 992 F.3d 1035, 1047–48 (10th Cir. 2021). The Ninth Circuit has likewise affirmed that courts may consider non-retroactive changes in law as part of the § 3582(c)(1)(A) analysis. *United States v. Chen*, 48 F.4th 1092, 1098–1100 (9th Cir. 2022).

Applying these principles here, Neal has served more than ten years of imprisonment—exceeding the ten-year threshold expressly contemplated by § 1B1.13(b)(6). In light of subsequent legal developments and current sentencing

21

practices, his sentence now stands in stark contrast to what would likely be imposed today, creating the type of gross disparity the amended policy statement was designed to address. Under controlling Ninth Circuit precedent and persuasive authority from other circuits, the length of Neal's sentence, the substantial time already served, and his individualized circumstances collectively constitute extraordinary and compelling reasons for a reduction in sentence.

Courts have routinely granted relief in analogous circumstances. See *United States v. Salliey*, Criminal Action No. RDB-10-0298 (D. Md. Feb. 13, 2023) (finding extraordinary and compelling reasons based on an unusually long sentence, substantial time served, and rehabilitation). As in *Salliey*, Neal has already served more than half of his sentence, and continued incarceration would no longer serve the interests of justice.

Accordingly, Neal has met his burden of demonstrating extraordinary and compelling reasons warranting a reduction in his term of imprisonment under 18 U.S.C. § 3582(c)(1)(A).

    5. <u>Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct</u>

With respect to the need to avoid unwarranted sentencing disparities, Davila-Reyes urges the Court to following cases:

    i. <u>*United States v. Clark*, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020)</u>

     • Quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary". *Id*. at *6.

ii. *United States v. Brooks*, Case No. 07-cr-20047-JES-DGB (C.D. Ill. May. 15, 2020)

- Quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in USSG § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

iii. *United States v. Johnson*, 2025 U.S. App. LEXIS 16661 (4th Cir. 2025)

- The Fourth Circuit upheld a district court's compassionate release where the sentencing disparity between a defendant and his co-defendants was vast and objectively significant. The court concluded that the district court did not abuse its discretion in considering that one defendant received life sentences while co-participants received significantly shorter terms for the same underlying conduct — a disparity the court found relevant to determining whether extraordinary and compelling reasons existed.

iv. *United States v. Harper*, 2024 U.S. Dist. LEXIS 41738 (N.D. Ga. Mar. 11, 2024)

- The Court rejected the government's argument that the Sentencing Commission exceeded its authority by implementing § 1B1.13(b)(6). This Guideline permits consideration of nonretroactive changes in sentencing laws when determining whether an unusually long sentence constitutes an extraordinary and compelling reason for a sentence reduction. The government argued that the policy conflicts with Congress' decisions on retroactivity and exceeds the Commission's legislative authority. The Court disagreed, finding no inherent conflict between the statute and the policy statement and noted that Congress could have modified or rejected the policy but chose not to.

23

> Deferring to the Sentencing Commission's guidance, the Court determined that Harper's sentence was unusually long, making him eligible for a reduction under § 1B1.13(b)(6).

Neal is now, in effect, to be re-sentenced today, after the passage of the First Step Act; and the need to avoid unwarranted sentencing disparities is to be assessed at the time of his sentencing today relative to those comparable offenders who have been sentenced following the passage of the First Step Act and grants of compassionate releases based on the need to avoid unwarranted sentencing disparities, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.

Neal essentially argues that the unwarranted sentencing disparity factor must be determined only with reference to those comparably situated defendants who— those being sentenced today under a different sentencing structure and/or received a reduction in sentence based on the need to avoid unwarranted sentencing disparities. Neal's sentence in 2016 is now disparate relative to Defendant's who were sentenced after December 21, 2018.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in

24

light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556; *Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly account for unwarranted disparities between codefendants who are similarly situated, and...the district court may compare defendants when deciding a sentence."); *United States v. Zavala*, 300 F. App'x 792, 795 (11th Cir. 2008) ("It is not erroneous for the district court to have considered the 'unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' when the statute specifically mandates such consideration."); *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

If granted compassionate release, Neal will not be returning to uncertainty. He has proactively secured structured transitional housing options to ensure stability and accountability during reentry. Northern Alliance Reentry Inc. and Price House have both been identified as his potential residences. See Exhibit 4. These are not informal arrangements; they are established transitional living programs designed specifically to support successful reintegration. By pursuing these placements, Neal demonstrates foresight and a clear understanding that reentry requires structure, community, and continued accountability.

His daughter, Asyata Davis ("Davis"), writes not merely as a family member

25

longing for reunion, but as someone who has witnessed her father's growth from a distance over eleven difficult years. *Id.* Davis describes a man who has reflected deeply, matured, and committed himself to becoming better. *Id.* Davis recalls the father who showed up, offered guidance, and cared for others. Her letter speaks to both loss and hope: loss of time, and hope that redemption is real. Davis assures the Court that Neal will return to a stable home filled with love and structure, with employment already lined up and a determination to rebuild his life lawfully. *Id.* Her words underscore the generational impact of this decision—not simply releasing an inmate, but restoring a father.

Kristin Rocheleau ("Rocheleau"), Neal's partner, echoes this theme of growth and accountability. *Id.* Rocheleau emphasizes that during more than eleven years of incarceration, Neal has maintained clear conduct and used his time to reflect and change. Rocheleau speaks to his remorse and humility, and to the sincerity she hears when he speaks about giving back and becoming a positive role model. Importantly, she highlights a pressing family need: Neal's mother's declining health. Compassionate release would not simply allow Neal to work and rebuild; it would allow him to care for his mother during a vulnerable period in her life. Her letter reflects a stable support system and a structured living plan awaiting him.

Long-time friend Cameron Watts ("Watts") provides an outside perspective shaped by over twenty years of knowing Neal. *Id.* His letter focuses on character and consistency. He describes Neal as a man of integrity and empathy whose incarceration has refined—not erased—those qualities. Watts emphasizes that Neal's time in custody has been marked by education, self-improvement, mentorship, and a positive disciplinary record. Watts frames the question squarely: if the goals of incarceration are rehabilitation and deterrence, Neal has achieved them. Continued incarceration, in his view, no longer advances those goals. His support extends beyond words; he stands ready to assist with housing, mentorship, and structured reentry. *Id.*

Perhaps most concretely, Greg Cheeks ("Cheeks"), Managing Member of

FreezeU LLC, offers tangible employment. Cheeks confirms that upon release, his company is prepared to hire Neal as a consultant. *Id.* Cheeks attests to Neal's growth, maturity, and accountability, and expresses confidence that he will bring discipline and work ethic to the company. This is not speculative employment; it is a formal commitment from a business owner willing to provide structure, income, and mentorship. Stable employment is one of the strongest predictors of successful reentry and reduced recidivism. Cheeks' letter demonstrates that Neal's rehabilitation has earned real-world trust.

Beyond employment, Neal has secured practical reentry logistics. He has identified Northern Alliance Reentry Inc. and Price House as transitional living options, ensuring structured housing rather than instability. *Id.* Transportation—a frequent obstacle for returning citizens—has been addressed through a supporter, White, who owns a vehicle and has committed to transporting Neal to and from work. These details matter. They demonstrate foresight and preparation rather than aspiration.

Neal also intends to obtain his Commercial Driver's License as soon as he is eligible. The State of Alaska offers a program that funds CDL training, and he plans to enroll immediately upon release. This plan reflects long-term thinking and a commitment to financial independence, not merely short-term employment.

Taken together, the letters describe the same man from different vantage points: a father who has matured, a partner who has taken responsibility, a friend who has demonstrated integrity over decades, and an individual trusted by an employer with meaningful work. They consistently speak of remorse, growth, accountability, and readiness. They also demonstrate that Neal will not return to society alone. He will return to structure, employment, mentorship, transportation, and family responsibility.

Compassionate release would not represent leniency without safeguards. It would represent recognition that the purposes of sentencing—punishment, deterrence,

27

and rehabilitation—have been meaningfully served, and that Neal now stands ready to continue his redemption outside prison walls, supported by a community that believes in his transformation.

Accordingly, for the abovementioned reasons, the Court should consider his motion due to substantial extraordinary and compelling reasons.

## VI. CONCLUSION

For the above and foregoing reasons, Neal prays this Court would Grant his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and re-sentence him to time served, or any other relief that the Court deems appropriate.

Respectfully submitted,

Dated: February 24, 2026

SENECA LOYAL NEAL
REG. NO. 36074-086
FCI SAFFORD
FEDERAL CORR. INSTITUTION
P.O. BOX 9000
SAFFORD, AZ 85548
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on February __, 2026, a true and correct copy of the above and foregoing Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 was sent via U. S. Mail, postage prepaid, to Daniel Ethan Doty, Assistant U.S. Attorney at Office of the U.S. Attorney (Fairbanks), 101 12th Avenue, Room 310, Honolulu, Fairbanks, AK 99701.

SENECA LOYAL NEAL

28

CERTIFIED MAIL

9589 0710 5270 2818 0055 40

FREEDOM

Seneca _____
Federal Co_
PO Box
Safford, AZ 85548

THU 26 FEB 20
WVAZ PDC 850 Z

Ms. Candice M. Duncan
Clerk of Court
U.S. District Court
District of Alaska
101 12th Avenue, Room 332
Fairbanks, AK 99701